MORITZ & PINCOFF v. ADOUE & LOBIT et al.

(Court of Civil Appeals of Texas. Galveston. May 12, 1911.)

1. CARRIERS (§ 69*)—BILL OF LADING.

Plaintiffs' petition alleged that Y. was indebted to a cotton seed meal company, and in payment of that debt delivered to them forged negotiable ocean bills of lading representing cotton seed meal in transit; that the cotton seed meal company indorsed these bills of lading to defendants, who in turn negotiated them; plaintiffs becoming the ultimate holders. The bill further charged that plaintiffs had sold cotton seed meal for the company, and that these sales had been rescinded for delay in delivery, and that, by means of a bonus, the cotton seed meal company induced plaintiffs to buy these negotiable ocean bills of lading; that plaintiffs paid the consideration to persons named by defendants; that the negotiations were really carried on for the benefit of defendants, the cotton seed meal company being largely indebted to them, and their only hope for payment being the sale of these bills of lading; and that this sale was made with full knowledge of the dishonor of the bills of lading by the persons on whom they were drawn. *Held*, that the particular allegations showed that defendants were not the owners of these bills of lading, and, as they were not parties to the transactions between plaintiffs and the cotton seed meal company, the allegations that their only hope of payment was in the sale of these negotiable bills of lading cannot be taken as true on demurrer, but the petition must be construed to mean that they were not the owners, but were only interested in the sale, of the bills of lading, as they would receive the proceeds; furthermore that this sale was made with full knowledge of the dishonor of the bills of lading cannot mean that defendants knew of the forgeries, but only that they were refused by the persons to whom the meal had been shipped, and hence showed no liability of defendants, so that a demurrer to the bill was properly sustained.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 69.*]

2. CARRIERS (§ 58*)—BILL OF LADING—RIGHTS OF ACTION—NATURE OF RIGHT.

Where forged negotiable ocean bills of lading were negotiated by a third party, who acted merely as an intermediary for the owner, the bills being negotiated on the blank indorsement of the owner, the third party is not liable to the purchasers, even though he received the consideration of the bills of lading in payment of a debt due him from the owners, and though he had received assets from the owner to protect him from claims upon these bills of lading.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 179–190; Dec. Dig. § 58.*]

Appeal from District Court, Galveston County; Clay S. Briggs, Judge.

Action by Moritz & Pincoff against E. H. Young and B. Adoue and Joseph Lobit, copartners, doing business as Adoue & Lobit. From a judgment for defendants, plaintiffs appeal. Affirmed.

Marsene Johnson, Clough & Fuller, and O. S. York, for appellants. James B. & Charles J. Stubbs, for appellees.

REESE, J. This is an action by Moritz & Pincoff, residents of Hamburg, Germany, against E. H. Young and B. Adoue and Joseph

Lobit, partners, doing business under the firm name of Adoue & Lobit, to recover the value of certain cotton seed meal, alleged to be $50,000. Plaintiff dismissed as to E. H. Young.

The trial court sustained a general demurrer and certain special exceptions of Adoue & Lobit to the petition, and, the plaintiffs declining to amend, dismissed the cause, from which judgment plaintiffs appeal.

The first assignment of error complains of the action of the court in sustaining the general demurrer to the petition. So much of the plaintiffs' petition as is necessary to be considered in disposing of the questions arising upon the general demurrer and exceptions is as follows:

"That heretofore, to wit, on and about the 11th and 17th days of January, 1907, the defendant E. H. Young was indebted to the Galveston Cotton Seed Meal Company, a then corporation engaged in the business of exporting cotton seed products in the city of Galveston, in a large amount of cotton seed meal, to wit, 10,000 or more sacks, of the value of $50,000, and that on and about said dates the Galveston Cotton Seed Meal Company demanded of and from the said defendant E. H. Young repayment of said cotton seed meal in kind. That said Galveston Cotton Seed Meal Company desired to export at least a part of the cotton seed meal owed to it by the said E. H. Young, and upon informing the said E. H. Young of its desires in the premises the said E. H. Young, for the purpose of repaying the Galveston Cotton Seed Meal Company in kind, procured and delivered to the Galveston Cotton Seed Meal Company what purported to be negotiable ocean bills of lading, representing 6,770 sacks of cotton seed meal, of the value of $16,000, such bills of lading purporting to have been signed by the master of the steamer Narlyn, as receiving from the Galveston Cotton Seed Meal Company the said 6,770 sacks of cotton seed meal for shipment to the order of the Galveston Cotton Seed Meal Company to Hamburg, Germany. But the plaintiffs allege that each and all of the said bills of lading were false, fictitious, and forged, that the signatures thereto were not the signatures of the master of said vessel, and that the cotton seed meal purporting to have been received by said vessel for shipment was not so received, and had never been delivered to said vessel for shipment, statement of which bills of lading is hereto attached, marked 'Exhibit A,' and made a part hereof.

"That the Galveston Cotton Seed Meal Company, by its indorsement in blank, negotiated said bills of lading to Adoue & Lobit, defendants herein, who in turn negotiated same, and the plaintiffs ultimately became purchasers and are now holders of same for value, and without notice of the forgeries, and in the manner hereinafter stated. That

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

plaintiffs had sold to other persons, for the account of the Galveston Cotton Seed Meal Company, a large quantity of cotton seed meal, deliveries to be made at Hamburg, Germany, and that to fulfill such contracts and to make such deliveries the said Galveston Cotton Seed Meal Company procured these bills of lading from the said E. H. Young; but that by reason of a delay in shipment the persons for whom the alleged cotton seed meal was ordered refused to accept the said bills of lading purporting to represent such shipments; whereupon the Galveston Cotton Seed Meal Company proposed to plaintiffs to allow ·them an extra margin on the price thereof and a cash bonus of $4,000, if they would accept said negotiable bills of lading and pay to the persons to whom Adoue & Lobit had forwarded same the full value thereof. And plaintiffs would show to the court that the said negotiations, while they were conducted by the Galveston Cotton Seed Meal Company, were in truth and in fact for the sole use, benefit, and advantage of Adoue & Lobit. That said Galveston Cotton Seed Meal Company was largely indebted to said Adoue & Lobit, and were insolvent, which was well known to all of said defendants, and that said Adoue & Lobit well knew that their only hope for payment of their debt against the Galveston Cotton Seed Meal Company was the sale by them of said negotiable bills of lading hereinbefore mentioned. That the bonus of $4,000 which was paid to the plaintiffs, as an inducement to purchase said false and fraudulent. bills of lading, was furnished and paid by Adoue & Lobit, defendants herein, with a full knowledge of the dishonor of said bills of lading by the persons on whom they were drawn, and was made by the said Adoue & Lobit for the sole purpose of persuading these plaintiffs to purchase said false and fraudulent bills of lading, in order that the said Adoue & Lobit might receive the benefits of said purchase, which plaintiffs here charge the said Adoue & Lobit to have received for their sole use and benefit. Plaintiffs would show to the court that upon purchasing said negotiable bills of lading, for which plaintiffs paid 64,765 marks, money of the empire of Germany, which "mark" is here alleged to be of the value of 24 cents in currency of the United States of America, the money so paid for the same was received by said Adoue & Lobit, and the same was by them applied as a general credit to satisfy in part an indebtedness of the Galveston Cotton Seed Meal Company to the said Adoue & Lobit not arising out of this transaction, and though often requested the said defendants, Adoue & Lobit, have failed and refused to pay to plaintiffs the sum of money so received, to their great damage, $35,000.

"That the defendants, Adoue & Lobit, upon becoming apprised of the fraudulent and fictitious character of the transaction and of the forged bills of lading, as hereinbefore set forth, they (the said Adoue & Lobit) procured from the Galveston Cotton Seed Meal Company, to idemnify them against loss by reason of these premises, a great quantity of assets, consisting of goods, wares, and merchandise, cotton seed meal, negotiable bills of lading, and other bills, assets, and evidences of assets, a detailed statement of which has been carefully concealed by the Galveston Cotton Seed Meal Company and Adoue & Lobit, and is unknown to plaintiffs. But the plaintiffs allege that the value of the goods, wares, and merchandise so taken as indemnity is largely in excess of the plaintiffs' debt and is at least of the value of $35,000.

"That the Galveston Cotton Seed Meal Company is openly and notoriously insolvent, and its stockholders, officers, and directors have abandoned the said corporation and have suffered its franchise to be forfeited for nonpayment of franchise tax. That in cause numbered 26,851, pending in this court, entitled Moritz & Pincoff v. Galveston Cotton Seed Meal Company, your honor granted and appointed a receiver for said corporation at the instance of these plaintiffs, and upon such receiver being appointed the officers of the Galveston Cotton Seed Meal Company fraudulently and feloniously shipped its books and papers out of the state of Texas, and at least one of the officers of said company removed from this state for the purpose of placing himself beyond the jurisdiction of this court, in an effort to perpetuate the wrong and fraud which had been practiced upon these plaintiffs. That the receiver of said corporation has answered that he can find no property or assets, books, or papers of said corporation. That the only remaining officer of said corporation, to wit, one A. E. Bush, has removed himself from the county of Galveston and state of Texas, and, instead of aiding these plaintiffs to collect the sum of money which is lawfully due them, the said Bush is conspiring to and with the said Young and said Adoue & Lobit in an effort to perpetuate the wrong and injury which he, as president of the then Galveston Cotton Seed Meal Company, had assisted in inflicting upon plaintiffs, as hereinbefore stated."

The petition makes no reference to any drafts drawn by the Galveston Cotton Seed Meal Company, nor to a negotiation thereof to Adoue & Lobit, nor to any assignment of the bills of lading to Adoue & Lobit as security therefor. So the case does not come within the principles laid down in the case of Blaisdell & Co. v. Bank, 96 Tex. 626, 75 S. W. 292, 62 L. R. A. 968, 97 Am. St. Rep. 944. If in fact Adoue & Lobit took the bills of lading as security for such drafts, in ignorance of the fact that they were forged, and received the money on such drafts, either from the drawee to whom the property had been sold, or from the plaintiffs to whom the drafts and bills of lading were delivered,

still in ignorance of the forgery of the bills of lading, under the authority of the case referred to, they would not be liable. This is not, however, the case made by the petition.

[1] It is charged that the bills of lading, which were forged, were by the Galveston Cotton Seed Meal Company negotiated to appellees by indorsement in blank, and that appellees in turn negotiated them, so that appellants ultimately became the owners thereof. If this was all, it might be contended that it appeared from the allegations of the petition that appellees had bought, and were the owners of, the forged bills of lading, and of the property which they were supposed to represent, and that, having themselves sold these bills for their own account, they must be held to have guaranteed their genuineness to appellants, into whose ownership and possession they ultimately came. But the petition proceeds to state the manner in which the transaction was effected, and the allegations rebut any inference that appellees became the owners in fact of the bills of lading, or of the property represented thereby, if in fact they had represented any property. It is charged that appellants had sold to other persons, for account of the Galveston Cotton Seed Meal Company, a large quantity of cotton seed meal, deliveries to be made in Hamburg, and that the bills of lading were procured by the cotton seed meal company from Young to fulfill this contract. Appellees are not alleged to have been interested in this contract, further than that the cotton seed meal company was largely indebted to them, and they were interested in its receiving payment for the meal, which was to come to them, and be applied to the payment of their debt, which did not arise out of this transaction. It is alleged: "And the said Adoue & Lobit well knew that their only hope for payment of their debt against the Galveston Cotton Seed Meal Company was the sale by them of said negotiable bills of lading."

Keeping in mind the allegation that this debt referred to did not arise out of this transaction, and had no connection with it, upon what theory could it be said that appellees' only hope of paying this debt was by the sale of these bills of lading? Certainly not upon the theory that they had bought the bills of lading, and that the property represented belonged to them. How could they expect to pay the debt of the cotton seed meal company by the sale of their own property? They could only expect to do this upon the theory that the bills of lading and the property represented thereby belonged to the cotton seed meal company, and were being handled by appellees primarily for account of the cotton seed meal company; their only interest in the transaction being to secure in this way payment of an indebtedness from the cotton seed meal company growing out of other transactions. For this purpose, it seems clear to us from the allegations of the petition that the bills of lading were indorsed in blank by the Galveston Cotton Seed Meal Company and placed in the hands of appellees. We think this is the only reasonable construction to be placed on the petition. Being, not the owners, but interested in the sale, of the bills of lading in the manner stated, it is not unreasonable that appellees, in order to enable the cotton seed meal company to get the money through them, and for their ultimate use in the payment of their debt, should have been willing to have the cotton seed meal company make the arrangement stated in the petition, in order to induce appellants to take the bills of lading and pay the money, and to have themselves furnished the $4,000 which was to be paid to appellants. This is stated to have been done "with a full knowledge of the dishonor of said bills of lading by the persons on whom they were drawn," meaning, evidently, the persons for whom the cotton seed meal had been shipped, and who on account of the delay in delivery had refused to take it. The fact is expressed very awkwardly, it is true; but the pleader could not have meant by this to charge that appellees at this time knew that the bills were forged, and had been dishonored by the persons by whom they had been issued.

[2] We think that the effect of the allegations is to charge appellees with having been merely an intermediary, acting for and in the interest of the cotton seed meal company. The bills were negotiated on the blank indorsement of this company alone, and the mere fact that appellees were to be the ultimate beneficiaries of the sale, in the payment of the debt of the company to them, they not being charged to have had any knowledge of the fraud, would not make them liable; nor would the fact that they had taken over the assets of the insolvent company to secure themselves from loss make them liable on these forged bills of lading. The trial court did not err in sustaining the general demurrer.

This renders it unnecessary to pass upon the several special exceptions which were also sustained. Most of these exceptions are of a trivial nature, and whether good or bad is of no importance, in view of the ruling upon the general demurrer.

We find no error requiring a reversal of the judgment, and it is therefore affirmed.

Affirmed.